# Excerpts from Criminal Trial Transcript
# Exhibit B

IN THE DISTRICT COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT

|  |  |  |
|---|---|---|
| MUNICIPALITY OF ANCHORAGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| MICHELLE V. MINOR, | ) | |
| | ) | |
| Defendant. | ) | No. 3AN-04-03149 CR |
| | ) | |

TRANSCRIPT OF PROCEEDINGS

September 8, 2004 - Pages 3 through 36

October 5, 2004 - Pages 37 through 72

October 6, 2004 - Pages 73 through 240

TRANSCRIPTS ONLY

1943 Hillcrest Drive

Anchorage, Alaska 99517

(907) 276-0306

Case 3:06-cv-00101-TMB    Document 27-5    Filed 09/28/2006    Page 3 of 15

MUNICIPALITY OF ANCHORAGE    MINOR                TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                    SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 7 to 10)

**Page 7**

1  the end of the meal they -- well, they were allegedly told by
2  the waiter, but this is a matter of disagreement, that the
3  special prices applied only at the downtown store. They were at
4  Spenard. The -- Mr. Gruner did not have the advertisement with
5  him at the time. At the end of the dinner Mr. Gruner actually
6  went and got the advertisement because he lived very close to
7  the restaurant, discovered that they were really correct that
8  they were -- that the special was advertised at each of the
9  restaurants.
10     So, anyway, what happened is there was a lengthy
11  discussion. Ultimately the party calculated conservatively what
12  would have been owed for food in accord with the terms of the
13  advertisement. They paid in full for alcohol. They figured
14  that they couldn't reduce that, and they paid in full for --
15  well, they gave the waiter a 30-dollar tip. They did not run
16  away. They identified themselves. They very clearly said that,
17  you know, this is the deal, this is what we were entitled to,
18  this is what we owe you. La Mex took the check and cashed it,
19  and the check says it's cashed in full settlement of the amount
20  in dispute. The amount in dispute I guess remains at about $44.
21     Now, the two arguments basically that we've made in our
22  brief -- well, let me back.....
23     THE COURT: Let me stop you right there. On that
24  factual -- what part of that factual basis is disputed,
25  Mr. McConnaughy?

**Page 8**

1     MR. McCONNAUGHY: What part of the factual basis that he's
2  given so far?
3     THE COURT: Yeah.
4     MR. McCONNAUGHY: Frankly, I wasn't following his facts
5  precisely. The facts that the Municipality expects to be able
6  to prove at trial I was going to get to in just a moment, but, I
7  mean, I wasn't actually listening carefully to what counsel was
8  saying about this as compared to -- I assumed he was just giving
9  you another rendition of the facts as was given in his motion
10  already. In terms of the disputed facts, the primary.....
11    THE COURT: Well, don't.....
12    MR. McCONNAUGHY: .....dispute.....
13    THE COURT: .....you have to -- what's -- in other words,
14  this is a case that you never screened. Where's the probable
15  cause for a crime? You have to have probable cause for a crime.
16    MR. McCONNAUGHY: The probable.....
17    THE COURT: Don't you? To proceed with prosecution.
18    MR. McCONNAUGHY: Yes, of course, you do.
19    THE COURT: There's no -- where's the probable cause?
20    MR. McCONNAUGHY: What do you mean where's the.....
21    THE COURT: They.....
22    MR. McCONNAUGHY: .....probable cause?
23    THE COURT: Yeah, where's.....
24    MR. McCONNAUGHY: You haven't heard my argument yet.
25    THE COURT: .....the probable cause in this case? Pardon?

**Page 9**

1     MR. McCONNAUGHY: You haven't heard my argument yet.
2     THE COURT: I -- that's.....
3     MR. McCONNAUGHY: You want.....
4     THE COURT: .....my question to you.
5     MR. McCONNAUGHY: Okay, you want me to respond?
6     THE COURT: Yeah.
7     MR. McCONNAUGHY: Your Honor, the -- essentially the
8  problem here has to do with the defense communicating that
9  there's simply no way the -- that the Municipality can show the
10  elements of an offense. They claim that we can't show that the
11  defendant obtained services by means of deception or any of the
12  other things that are stated in the ordinance, and the
13  Municipality's position is that there's clearly probable cause
14  based on the facts and the Municipality has a right to present
15  those facts to a jury in order to obtain a conviction at trial
16  if it so chooses to go forward with the thing. The fact is that
17  the Municipality expects to be able to produce evidence that the
18  defendant obtained services, that is to say, food, at the La Mex
19  restaurant in Spenard, which is one of the things that is
20  defined in the statute as being a service.
21    THE COURT: No dispute as to that fact.
22    MR. McCONNAUGHY: Okay, no dispute as to that fact.
23    THE COURT: She and her guests.....
24    MR. McCONNAUGHY: That those services, namely, getting the
25  food, is obtained solely by means of -- for compensation, that

**Page 10**

1  prior to getting the food Ms. Minor or some member of
2  Ms. Minor's party before they order said something to the waiter
3  about the April 1 special, and the waiter told them -- because
4  they were given menus that had the regular prices on them and
5  they said, well, what about the April 1 special, and the waiter
6  so, no, no, that's only valid at the downtown restaurant, and
7  the waiter -- and that after some discussion I think that the
8  police report indicated that Ms. Minor looked at one of the
9  other people and said you must have been mistaken or something
10  like that, and then the waiter -- then said we'll eat here
11  anyway, and then proceeded to order off of the menu that gave
12  the normal prices and went on and got the food that way.
13    And, frankly, I think that constitutes -- is pretty clear
14  when somebody tells somebody something like that, you're handed
15  a menu with a particular set of prices on it, you indicate,
16  well, I thought something or other about these prices, and the
17  person says, no, that's not correct, and he says, well, I'll go
18  ahead and order from this anyway, that you're indicating to that
19  person that you're going to go ahead and pay those prices that
20  are listed there on the menu, and then the waiter proceeds to
21  bring the food, and then they say, well, no, we're not going to
22  pay those prices because the special should have been in effect,
23  and I think that that constitutes a violation of the ordinance.
24  It's clearly deception. It's leading somebody into believing
25  something about what you're agreeing to do.

Case 3:06-cv-00101-TMB   Document 27-5   Filed 09/28/2006   Page 4 of 15

MUNICIPALITY OF ANCHORAGE . MINOR                        TRAN! IPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                          SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 55 to 58)

**Page 55**

1  A   I did not.
2      MR. WARREN: Your Honor, once again I'd like to offer
3  this. If -- whether she saw it or not is really circumstantial
4  and it's a question for the jury to decide, but I think it's
5  been well established that it was posted in a prominent place in
6  plain view, and at least during the period of time that the
7  officer was there someone didn't walk over and put it up, so it
8  could be inferred that it was probably there when the defendant
9  arrived as well.
10     MR. JACOBUS: A couple voir dire questions, Your Honor?
11     THE COURT: Any objection to allowing the defense to voir
12 dire on the subject before ruling?
13     MR. WARREN: No, Your Honor.
14     THE COURT: Go ahead.
15 VOIR DIRE BY MR. JACOBUS:
16 Q   This particular exhibit, is this the actual size it was or
17     had -- has it been enlarged or reduced for the Court?
18 A   I didn't enlarge it or reduce it.
19 Q   How far away was this from the path that people would
20     ordinarily be walking into the restaurant where it was
21     posted?
22 A   Three -- two to three feet.
23 Q   Was it posted with a lot of other things?
24 A   I don't recall what was specifically around it at that
25     time. I can tell you what's normally there. There's

**Page 56**

1      advertisements, and then it's a place where they usually
2      post crayon drawings by apparently kids who frequent the
3      restaurant.
4  Q   And I guess this night they would have also had what do
5      you call it, banners and things because of the.....
6  A   They.....
7  Q   .....celebration?
8  A   They may have.
9      MR. JACOBUS: No further questions. Still the -- still
10 continuing objection for the same reasons.
11     THE COURT: Objection sustained. That doesn't mean you
12 can't bring it up again with an appropriate witness if you wish
13 to.
14     MR. WARREN: Yes, Your Honor.
15     MR. JACOBUS: Our witnesses will be perfectly happy to
16 answer with respect to this.....
17     THE COURT: Well, this is.....
18     MR. JACOBUS: .....exhibit, Your Honor.
19     THE COURT: .....their case, so let them put it on.
20     MR. JACOBUS: Yes, Your Honor.
21          DIRECT EXAMINATION CONTINUED
22 BY MR. WARREN:
23 Q   Officer Bell, when you came in who was the first person
24     that you spoke to?
25 A   The manager.

**Page 57**

1  Q   Do you recall what her name was?
2  A   Ablecop, I believe, Ms. Ablecop.
3  Q   And did she help you assess the situation at the time?
4  A   She did. I -- I contacted her first because typically our
5      policy is to contact the complainant if we can first, in
6      other words, whoever originated the call.
7  Q   And what was the situation that she explained to you?
8  A   She explained to me that there was a customer, pointed out
9      Ms. Minor, who was -- had ordered some food and drinks and
10     was refusing to pay the full amount for the check. She --
11     she went on to tell me the -- the reason that she was
12     given was that -- of an advertisement where La Mex had
13     advertised that they were going to offer a 1969 menu at
14     the downtown location, which is a separate menu, it was
15     explained to me it was a separate menu than their normal
16     menu, and it was the menu that was offered in 1969 with
17     the prices of 1969, and one of the prices I recall was
18     under two dollars for whatever meal it was, and she
19     explained to me that the -- Ms. Minor was upset that she
20     had -- had an advertisement that didn't specifically
21     indicate the downtown location, that the Spenard only, and
22     that she told me that Ms. Minor and her party was informed
23     that that advertisement wasn't honored at that location,
24     but the downtown only, and that Ms. Minor was only
25     offering to pay a partial bill based on her calculations

**Page 58**

1      of what was -- today's prices should be minus inflation
2      and some other calculations.
3  Q   So based on her explanation of the situation did you then
4      proceed to go over and speak with Mrs. Minor?
5  A   Yes, I did.
6  Q   And when you spoke with her did she tell you that -- or
7      what did she say when you went over and asked her about
8      the situation?
9  A   Essentially like Ms. -- the manager indicated, that --
10     Ms. Minor's problem as she indicated to me was that there
11     was an advertisement that didn't specifically state that
12     the prices were going to be at the downtown location only,
13     that the loc-- that the prices would indicate at all three
14     locations for the La Mex, and that she was offering to pay
15     what she deemed was fair for 1969 prices, and that that's
16     all she was paying.
17 Q   Did you ask her which menu she used?
18 A   I did, because that seemed to be the issue at the time for
19     me was a menu, because I was told by the manager that
20     there was a specific menu apparently for the downtown
21     location.
22 Q   And what was her response?
23     MR. JACOBUS: Your Honor, some of this -- hearsay.
24     THE COURT: It is, and it's.....
25     MR. JACOBUS: Objectionable.

Case 3:06-cv-00101-TMB  Document 27-5  Filed 09/28/2006  Page 5 of 15
MUNICIPALITY OF ANC‘ ‘AGE v. MINOR                    ‘ANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 ⌐K                SEPTEMBER 8, ᴜCTOBER 5 & OCTOBER 6, 2004

(Pages 59 to 62)

**Page 59**

1  THE COURT: .....sustained. Please disregard the
2  statement by the officer as to what the manager said in his last
3  answer. Go ahead.
4  MR. WARREN: To make sure I'm clear on what is permitted
5  at this point, Your Honor, may I.....
6  THE COURT: Well, with regard to the advertisement it's
7  balancing under 400 series of the evidence rules with regard to
8  the statements of hearsay. If an objection's made I'll either
9  deny it or sustain it depending on hearsay alone.
10  MR. WARREN: Let me rephrase that, Your Honor. I'm going
11  to back up for just a moment to make.....
12  THE COURT: Go ahead.
13  MR. WARREN: .....sure that we are clear, because really
14  I'm focusing on the menu at this point. I'm not focusing on any
15  other advertisements.
16  Q  You were speaking with Ms. Minor. What did you ask her
17     about the menu?
18  A  I asked her which menu she ordered from, what.....
19  Q  And.....
20  A  .....prices were on the menu.....
21  Q  This was.....
22  A  .....she ordered from.
23  Q  .....the defendant that you asked about.
24  A  Yes.
25  Q  And what was her response?

**Page 60**

1  A  She told me she ordered from the regular menu and the
2     prices were full price.
3  Q  Did you make any further followups with her after she told
4     you that she reviewed this full-price menu?
5  A  I did. We -- as a police officer we respond to cases
6     similar to this a lot, so my main objective was to try to
7     reason with her, get her to satisfy the bill, and then
8     take civil recourse if she felt there was civil recourse.
9     I suggested to her that -- that if she felt there was
10    false advertisement that what -- the proper course would
11    be to pay the bill, hire an attorney, sue the -- La Mex
12    for the difference or whatever she felt like she was
13    wronged, and that's when she told me that she was an
14    attorney and that she wasn't going to pay the bill.
15  Q  And did she, in fact, pay the bill that night?
16  A  She did not pay the bill in full, no.
17  Q  Did she write a check for some form of payment?
18  A  Yes.
19  Q  Do you recall what the amount was?
20  A  Hundred and twenty-seven dollars and some change, I
21     believe.
22  Q  Do you recall what the original bill was for?
23  A  A hundred and seventy-one forty, I believe.
24  Q  And how do you know that?
25  A  Because I have copies of them in my police report that I

**Page 61**

1     reviewed.
2  Q  How did you learn what the bill was?
3  A  I was given a copy of it by the manager.
4  MR. WARREN: Okay. Do you have any objection to offering
5  this?
6  MR. JACOBUS: Other than the fact that it's -- has police
7  department all over it. We have a copy of it which.....
8  THE COURT: What are you discussing?
9  MR. JACOBUS: Oh, we're discussing the appropriateness of
10  our Exhibit 2 as opposed to their -- I'm sorry, our Exhibit B as
11  opposed to their Exhibit 2.
12  THE COURT: So you showed.....
13  MR. JACOBUS: It.....
14  THE COURT: .....that to counsel at.....
15  MR. JACOBUS: They're the same receipts except this one
16  has, as I said, police department all over it. Ours just shows
17  the receipts.
18  THE COURT: All right, do you want to use it, counsel?
19  MR. WARREN: Yes, Your Honor, I would like to use it.
20  THE COURT: Mind if I look at it?
21  MR. WARREN: Yes. No, I don't mind.
22  THE COURT: Thanks.
23  MR. JACOBUS: As far as the receipts that are represented
24  there, it is accurate.
25  THE COURT: Okay. Why don't you go ahead and make a

**Page 62**

1  inquiry, then, and if you wish to have it admitted then the
2  objection will be sustained and you can use theirs without the
3  extra information on it. Okay. You're trying to get in the
4  receipts, right?
5  MR. WARREN: Yes, Your Honor.
6  THE COURT: Go ahead.
7  MR. WARREN: Perhaps we could just offer a redacted
8  version. Would that.....
9  THE COURT: Sure.
10  MR. WARREN: (Indiscernible) I have a pen that would mark
11  this out dark.....
12  THE COURT: Or you can use their Exhibit B.
13  MR. WARREN: Okay, Your Honor.
14  THE COURT: Any objection to their.....
15  MR. WARREN: Right there.
16  THE COURT: .....to the prosecution using your exhibit?
17  MR. JACOBUS: No, Your Honor.
18  THE COURT: Okay.
19  MR. JACOBUS: Not at all.
20  THE COURT: Thank you. Again, members of the jury, it
21  doesn't matter which side puts a mark on it, whether it's a
22  number or an alphabet letter. If it's admitted, which this
23  hasn't been yet, it's just evidence that's admitted. Go ahead.
24  Q  I'm showing you what's been marked as Defendant's
25     Exhibit B.

Case 3:06-cv-00101-TMB   Document 27-5   Filed 09/28/2006   Page 6 of 15
MUNICIPALITY OF ANCHORAGE . MINOR                TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                    SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 63 to 66)

**Page 63**

1  MR. JACOBUS: We'd stipulate to its admission, Your Honor.
2  THE COURT: Okay. Do you want to admit it?
3  MR. WARREN: Yes, Your Honor.
4  THE COURT: It's admitted. That's Exhibit B.
5  (Defendant's Exhibit B admitted)
6  Q  Do you -- does this -- is this document familiar to you?
7  A  Well, actually, no, I don't think. It looks like they've
8     added it on this one; is that correct? The copies that I
9     have, that I've referred to, are the food separated from
10    the alcohol piece is all, so.....
11 Q  Okay.
12 A  .....the total amount would indicate this one, yeah.
13 Q  Right. So does this -- do you believe that this is a
14    repre-- true and correct representation of what was on the
15    receipt to be?
16 A  Yes, the -- the -- the total amounts appear to be the
17    same.
18 Q  Okay, thank you. And having knowledge of what the total
19    amount was for the bill, was the bill paid in full?
20 A  No, it wasn't. Was not.
21 Q  And did you explain to the defendant that -- what your
22    position was with regard to whether she should pay the
23    bill or not?
24 A  Yes, I did. I mean, I explained to her that I'd be forced
25    to arrest her if she wouldn't pay the bill in total,

**Page 64**

1     that -- that she ordered the food at full price, she was
2     going to have to pay the full price, and if she didn't,
3     she'd be arrested, and she essentially said go ahead and
4     arrest me.
5  Q  And at that point did you call your supervisor?
6     MR. JACOBUS: Leading, again. You know, ask him what he
7  did when.....
8  Q  Okay, what did you do at that point in time?
9     THE COURT: Thank you.
10 A  At this point because I was getting a lot of resistance
11    from someone who smelled of alcohol, was being
12    belligerent, raising her voice, causing a scene,
13    proclaiming to be a lawyer, I asked if she'd like to see
14    my supervisor because sometimes supervisors can say -- say
15    the same thing and -- I -- I -- I got the impression she
16    felt she was above me and wanted someone superior to me.
17 Q  And what happened at that point?
18 A  I called my supervisor to come over and talk with
19    Ms. Minor.
20 Q  Did your supervisor in fact show up?
21 A  Yes, he did.
22 Q  Were you a party to that conversation?
23 A  Between the two? I was standing there, yes.
24 Q  Yes. And what did he state to her?
25 A  He -- he -- he went through the same thing that I did.

**Page 65**

1     MR. JACOBUS: Again, hearsay. I think he's going to be
2  called to testify, Your Honor.
3     THE COURT: Sustained.
4     MR. WARREN: Your Honor, I'm not offering it to prove the
5  truth of the matter that the supervisor was stating. I'm trying
6  to find out what was going on at the time, I mean, what was the
7  defendant's state of mind here.
8     THE COURT: So it goes to defendant's state of mind?
9     MR. WARREN: Yes, and it also goes to basically the
10 present sense impression of this witness that's testifying, and
11 he can explain to us what the circumstances were of that
12 exchange.
13    THE COURT: And you're going to tie it up to the alleged
14 crime.
15    MR. WARREN: Well, Your Honor, that way I can find out
16 what the defendant said in response.
17    MR. JACOBUS: We're way beyond the alleged crime, Your
18 Honor. This is again relevance.
19    THE COURT: I know. They're.....
20    MR. JACOBUS: Objection, relevance.
21    THE COURT: What relevance is there to this whole
22 conversation?
23    MR. WARREN: Well, Your Honor, it's relevant because it
24 shows what her state of mind was and her intent with regard to
25 payment of the bill.

**Page 66**

1     THE COURT: Why don't you just ask him what he -- what she
2  said in his hearing relative to intent.
3  Q  What did the defendant state in your hearing relative to
4     intent?
5  A  That she wasn't going to pay the bill, and again
6     challenged him to arrest her.
7     MR. WARREN: Thank you. I have no further.....
8     THE COURT: Okay, any cross-examination?
9     MR. WARREN: One further question, Your Honor.
10 Q  And did this all take place within the third judicial
11    district?
12 A  Yes, it did.
13    MR. WARREN: Thank you.
14    THE COURT: Go ahead.
15    MR. JACOBUS: Thank you.
16          OFFICER JEFFERY BELL
17 testified as follows on:
18          CROSS-EXAMINATION
19 BY MR. JACOBUS:
20 Q  Just have a few questions, probably take five minutes or
21    less.
22 A  Okay.
23 Q  Do you have any personal knowledge of what took place
24    prior to the time you arrived, or was it just simply what
25    people told you took place?

Case 3:06-cv-00101-TMB   Document 27-5   Filed 09/28/2006   Page 7 of 15

MUNICIPALITY OF ANC AGE v. MINOR                    RANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                         SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 67 to 70)

**Page 67**

1  A   It was just what I was told.
2  Q   Did Ms. -- who did -- you talked to Ms. Minor. Did you
3      talk to any of Ms. Minor's friends?
4  A   I don't believe I conducted any interviews with those. I
5      con-- talked to Ms. Minor, the manager and the server.
6  Q   Did Ms. Minor identify herself, tell you who she was?
7  A   She told me who she was, but she refused to identify
8      herself by identification.
9  Q   She told you she was Michelle Minor.
10 A   I didn't know that's who -- who it was. I knew.....
11 Q   Oh, but that's what she.....
12 A   .....that's who she.....
13 Q   .....told you, though.
14 A   That's who she told me she was.
15 Q   Okay. Let me -- who arrested Ms. Minor?
16 A   Who physically took her into custody?
17 Q   Who arrested her?
18 A   Because.....
19 Q   You did?
20 A   Somebody separate did the paperwork and somebody different
21     took her into -- actually put handcuffs on her. Sergeant
22     Leblanc put handcuffs on her.
23 Q   Who did the paperwork?
24 A   Mr. Blanton (ph), Officer Blanton, I believe, most of the
25     arresting paperwork. We all did supplemental reports.

**Page 68**

1  Q   Let me show you something here. Let me show you
2      Defendant's Exhibit E. Is this your signature on it at
3      the bottom, it says Jeff Bell?
4  A   Yes, it is.
5  Q   Doesn't that really state that the arrest was really
6      made.....
7      MR. WARREN: Objection, Your Honor, relevance.
8  Q   .....by the restaurant?
9      THE COURT: I'm sorry, that's -- what's the objection?
10     MR. WARREN: Relevance.
11     THE COURT: Okay, what is the relevance of this, counsel?
12     MR. JACOBUS: The relevance of this?
13     THE COURT: Yes.
14     MR. JACOBUS: Is to show that the arrest was made by the
15 restaurant, not by the police department. This was a form which
16 was -- I'm going to have to ask this.
17     THE COURT: Okay. It is.....
18     MR. WARREN: It's also hearsay, Your Honor.
19     MR. JACOBUS: No.
20     THE COURT: The -- depending on.....
21     MR. JACOBUS: (Indiscernible).
22     THE COURT: .....on what actions the restaurant took, it
23 may have bearing relative to the case. I'll allow the question,
24 but again there's going to be a jury instruction that the fact
25 that a person is arrested has no bearing on whether they

**Page 69**

1  committed a crime, right? So go.....
2      MR. JACOBUS: Well, I would certainly.....
3      THE COURT: .....ahead and ask your question.
4      MR. JACOBUS: .....hope so, yes.
5      THE COURT: Well, go ahead and ask your question.
6      MR. JACOBUS: But that's not -- that isn't really what the
7  issue is.
8  Q   This form that was filled out, where did the form come
9      from, if you know?
10 A   Originally?
11 Q   Yes.
12 A   It's a department form.
13 Q   It's a blank department form?
14 A   Yes.
15 Q   Would you have given this to Ms. Ablecop at the time of
16     the incident?
17 A   Yes. I mean, I may -- I may have been the one that
18     provided it to her since I was the one who signed it, yes.
19 Q   Did you ask her to -- for her to perform the arrest as a
20     private person?
21 A   Do I -- am I -- do I explain private person's arrest
22     versus non private person's arrest now, or is that
23     something lawyers are going to do?
24 Q   No, go ahead, what your understanding of it -- explain
25     private person versus police officer arrest.

**Page 70**

1  A   This crime is a misdemeanor because of the value of the
2      dollar amount, and a misdemeanor's not committed in my
3      presence we have to have what's called a private person's
4      arrest, and that would be a victim of an assault or victim
5      of a theft or something like that would fill out paperwork
6      indicating that that had transpired and requesting me or
7      demand me as a peace officer to arrest that person.
8  Q   Actually, it's entitled certificate and declaration of
9      arrest by private person and delivery of person so
10     arrested to the police officer. Is that actually what it
11     does?
12 A   It requests that -- it req-- a private -- if there's
13     probable cause, a private citizen can request that a
14     police officer arrest someone.
15     MR. JACOBUS: Move for the admission of this document,
16 Your Honor, Exhibit A.
17     THE COURT: Any objection?
18     MR. WARREN: Yes, Your Honor.
19     THE COURT: And what's the objection?
20     MR. WARREN: Relevance, once again. This has no bearing
21 on the commission of the crime.
22     THE COURT: I'm going to withhold ruling on it to find out
23 if there's other evidence that may be pertinent relative to the
24 issue. Okay. Any other questions of this witness?
25     MR. JACOBUS: Just a minute, Your Honor, I will see. No,

Case 3:06-cv-00101-TMB    Document 27-5    Filed 09/28/2006    Page 8 of 15

MUNICIPALITY OF ANCHORAGE v. MINOR                          TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                                    SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 99 to 102)

**Page 99**

1  her that if she didn't, she was going to be arrested, and
2  she just kind of stood there looking at me and said, well,
3  and I took that as an indication of she was going to be
4  arrested.
5  Q  In your contact with her did you have -- were you able to
6     determine -- or were you able to observe her attitude or
7     demeanor?
8  A  Yes. You know, I noticed an odor of alcohol, which I
9     think probably had a lot to do with the overall situation.
10    She was nasty. I mean, I guess that's about the nicest
11    word I can use. She was very, very vocal about the fact
12    that she was an attorney, kind of I'm better than
13    everybody else attitude is what I -- I got. I felt kind
14    of bad for the staff at the -- at the restaurant because
15    I.....
16    MR. JACOBUS: Your Honor, this is beyond the -- this is
17 beyond relevance to the offense.
18    THE COURT: I believe it may well be.
19    MR. WARREN: I'll move on, Judge.
20    THE COURT: Sustained.
21 Q  Anything else -- any other observations with regards to
22    her demeanor other than nasty and superior?
23 A  Other than the odor of alcohol, no.
24 Q  And so when she said to you, well, what did you do?
25 A  I placed her under arrest. I told her to stand up, put

**Page 100**

1  her hands behind her back. She didn't, and I took control
2  of one arm and put it behind her back using a soft empty
3  hand control technique, and gave her commands to put the
4  other hand behind her back.
5  Q  Now.....
6     MR. JACOBUS: Objection, Your Honor, this is way beyond
7  the scope of the.....
8     THE COURT: Is there -- is it leading.....
9     MR. JACOBUS: .....the charge.
10    THE COURT: .....to something?
11    MR. SPIROPOULOS: Judge, it goes to the defendant's
12 attitude, demeanor, goes to her intent.
13    THE COURT: Okay, if it does.
14    MR. JACOBUS: Well, Your Honor, intent has to do with
15 fraudulent intent with respect to the charge, not to -- once
16 you're beyond this it's.....
17    THE COURT: Well, if the prosecutor says that he's going
18 to tie it into the intent with the charge, I'll let him do that.
19 Go ahead.
20 Q  Now, you said she was sitting down when you walk in and
21    talk to her. Was she seated the whole time?
22 A  She was seated -- actually, the first thing I did when I
23    walked in and approached her was I asked her to step out
24    into the entryway, to separate her from this other group
25    of people so that we could discuss this incident with the

**Page 101**

1     hope that maybe we could resolve this without making it a
2     criminal issue.
3  Q  And did you wind up stepping outside and speaking with
4     her?
5  A  No, she -- she did not want to do that.
6  Q  Okay. Now, we heard some reference earlier.....
7     MR. SPIROPOULOS: If I may retrieve an exhibit, Madam
8  Clerk? Showing opposing counsel what's been marked into
9  evidence as Defendant's Exhibit E for identification.
10    MR. JACOBUS: Oh, I've seen that, yes.
11 Q  Officer -- Sergeant, can you tell us what a private
12    person's arrest form is?
13 A  A private person's arrest form is a form we use. It's
14    kind of almost like a release of liability. Basically, it
15    establishes the probable cause for an arrest for a
16    misdemeanor that didn't occur in the presence of a police
17    officer. In this case it really -- wasn't really required
18    because she was refusing to pay right in front of the
19    police, so the misdemeanor was occurring in our presence,
20    but as just a normal course of business when we have a
21    citizen that wants somebody arrested for a crime we would
22    have them fill out a private person's arrest form and sign
23    it, just as an additional piece of documentation to put
24    with our reports.
25    MR. SPIROPOULOS: May I approach, Judge?

**Page 102**

1     THE COURT: Yes.
2  Q  Showing you what's been marked as Defendant's Exhibit E in
3     evidence, do you recognize what that form is?
4  A  This is a private person's arrest form.
5  Q  And when you say private person's arrest does that mean
6     that the person that filled out that form actually put
7     like handcuffs and arrested somebody?
8  A  No. It's more of a semantical thing. We do all the work
9     for them. They just sign, basically taking responsibility
10    for the act.
11 Q  May I retrieve these? Now, you mentioned earlier that you
12    don't normally respond to these types of -- this type of
13    crime.
14 A  Correct.
15 Q  Is that right?
16 A  As a sergeant I wouldn't normally respond. The only
17    reason why I would respond is if an officer wasn't
18    available and I was close by and I could take care of it
19    quickly.
20 Q  Okay. You also indicated that you deal with officer
21    complaints?
22 A  Yes, I do.
23 Q  Did you receive any complaints regarding Officer Bell in
24    this matter?
25 A  Not that I'm aware of. I personally haven't received any

Case 3:06-cv-00101-TMB    Document 27-5    Filed 09/28/2006    Page 9 of 15

MUNICIPALITY OF ANCHORAGE     MINOR          TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                     SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 103 to 106)

---

**Page 103**

1  complaints.
2  Q  And do you -- are you aware of any complaints
3     involved -- involving you in this matter? Was a complaint
4     made against you?
5  A  No.
6  Q  And how about Officer Blanton?
7  A  No.
8     MR. JACOBUS: This is way beyond the.....
9     THE COURT: Yes, sustained.
10    MR. JACOBUS: .....scope of the offense, Your Honor.
11    THE COURT: What does this have to do with the case?
12    MR. SPIROPOULOS: I'm sorry, Judge?
13    THE COURT: Is there some relevance?
14    MR. SPIROPOULOS: Judge, it's relevant to show that the
15 police were following their procedures. Counsel has raised the
16 issue and counsel introduced into evidence a private person's
17 arrest form and cross-examined this other officer, asking him if
18 somebody, quote, arrested the other, leaving the inference that
19 the police somehow did something wrong. This rebuts that
20 inference, Judge.
21    THE COURT: Okay. Objection sustained. Go ahead, please.
22 Q  You indicated that as a supervisor this was a minor crime.
23    When the defendant was arrested was she then released?
24 A  No. Eventually she was released, but not immediately.
25 Q  Okay.

---

**Page 104**

1     MR. JACOBUS: Your Honor, again, relevance to the offense
2  charged.
3     MR. SPIROPOULOS: Not only was this brought out on direct
4  examination by Officer Bell, Judge, I believe counsel cross-
5  examined on this matter as to what happened after her arrest.
6     THE COURT: What relevance is there?
7     MR. SPIROPOULOS: Judge, this ties up -- the relevance
8  objection was not posed with Officer Bell. The testimony by
9  Officer Bell was not complete and was I believe cross-examined.
10 I could be in error on that. I do not have the notes from
11 yesterday. Judge, the bell's been rung, so to speak.
12    THE COURT: Okay.
13    MR. JACOBUS: But that doesn't.....
14    THE COURT: Objection.....
15    MR. JACOBUS: .....matter, Your.....
16    THE COURT: .....sustained.
17    MR. JACOBUS: Thank you.
18    MR. SPIROPOULOS: Okay.
19 Q  Did you in your conversation before you arrested the
20    defendant tell her or suggest to her any alternatives
21    other than arrest.....
22 A  I did.
23 Q  .....in this matter?
24 A  I did. Matter of fact, I actually brought up the point
25    because she was very vocal about being a lawyer that she

---

**Page 105**

1     should know the proper course to deal with this. One
2     would be she could either, A, write the business owner a
3     letter comp-- you know, complaining about what she was
4     displeased about, or two, she could file a civil suit for
5     what she felt was the amount she'd ben overcharged.
6  Q  And all these events occurred within the third judicial
7     district at Anchorage, Alaska?
8  A  Yes, they did.
9     MR. SPIROPOULOS: May I have a moment, Judge?
10    THE COURT: Yes.
11    MR. SPIROPOULOS: That's all I have.
12    THE COURT: Any cross-examination?
13    MR. JACOBUS: Yes, Your Honor, but just a minute here.
14             SERGEANT ROY LEBLANC
15 testified as follows on:
16             CROSS-EXAMINATION
17 BY MR. JACOBUS:
18 Q  Let me just ask a few questions. First, that arrest form
19    that was filled out by Ms. Ablecop and signed, which was
20    Exhibit E that was shown to you?
21 A  Correct.
22 Q  I think you indicated that you could have arrested
23    Ms. Minor without having that form; is that correct?
24 A  Yes.
25 Q  And you also indicated that that form was a release -- in

---

**Page 106**

1     essence a release of liability to protect the police
2     department from responsibility for the arrest; is that
3     correct?
4  A  It's -- it's a release of liability form, yes.
5  Q  Because the responsibility for the arrest would then be on
6     the individual person.
7  A  Not necessarily complete, but it is a liability form. It
8     actually says that on the form.
9  Q  By the way, was Ms. Minor ever given a Breathalyzer test?
10 A  Not that I'm aware of.
11 Q  Did she -- was she given any of the standard tests that
12    are given to a person when he's stopped for drunk driving
13    or anything like that?
14 A  If you're referring to field sobriety tests, I.....
15 Q  Field sobriety tests, right.
16 A  I don't believe she was given any field sobriety tests.
17    There was no alcohol crime that we were investigating.
18 Q  So all that you're saying is you just smelled basically
19    that she'd had some alcohol.
20 A  Right. There was an odor of alcohol about her person.
21 Q  And she wasn't staggering or slurring her speech or
22    anything like that or anything which would have caused her
23    to fail this field sobriety test.
24 A  There were no field sobriety tests issued or administered.
25 Q  Normally do you -- do the -- does the police department

Case 3:06-cv-00101-TMB   Document 27-5   Filed 09/28/2006   Page 10 of 15

MUNICIPALITY OF ANC   `AGE v. MINOR                    `ANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 _R                       SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 195 to 198)

```
 1  Q  And how long have you practiced law in Alaska?
 2  A  Since 1975.
 3  Q  When's the first time you ate at La Mex?  If you recall.
 4  A  Probably in the late '70s.
 5  Q  Would you have eaten at the Spenard location?
 6  A  That's the only one there was.
 7  Q  How did you become aware of this particular April 1st,
 8     2004 promotional that we've been discussing for these
 9     couple of days?
10  A  Max called me sometime in the middle of March and said,
11     hey, there's this deal at La Mex and Amy had cut out the
12     ad, this ad, and put it up on the refrigerator, and it was
13     going to be a good deal and excuse to get together,
14     so -- and eat cheap food.
15  Q  So you agreed to participate?
16  A  Oh, yeah.
17  Q  And how did you -- did you call other people to get them
18     to participate?
19  A  Yeah, I called -- I called a couple of other friends,
20     Andy -- Andy Nations, and her husband Scott was going to
21     be out of town, and may have called a coup-- couple of
22     other people, but I can't remember right now.  I called
23     Bob.
24  Q  When did you call Bob?
25  A  The same day.  I -- I'm -- I'm sure I'd mentioned it to
                                                             195
```

```
 1     him before, but he's in and out of town so I called him at
 2     the last minute.  He's already ready to eat.
 3  Q  And he was.
 4  A  Yeah.
 5  Q  What time did you get to the -- to La Mex that evening?
 6  A  I was late.
 7  Q  Why were you late?
 8  A  Well, I'd been downtown in court and I had my client in my
 9     car -- or my client and I had come downtown for a
10     settlement conference and we had to go back out to my
11     office on the south end, and -- and I had to do a couple
12     things at the office and stop at the bank, which closed at
13     6:00, so I know I got -- got to La Mex probably 15 minutes
14     or so after 6:00, maybe later.
15  Q  What did you discover when you got to La Mex?
16  A  Well, they had big banners outside like everybody's
17     always -- already talked about, and -- and inside, and
18     there were a lot of people in the waiting area.  Max had
19     called me earlier in the day and said he'd made
20     reservations, so when I came in I sort of wound my way
21     through the people in the waiting area and asked at the
22     desk where we were seated, and the hostess said, well, are
23     you here with another party, I said yes, and she says,
24     well, just go back there, and she sort of waved towards
25     the back of the room, and look for them.  So I did.
                                                             196
```

```
 1  Q  And you found them.
 2  A  Yeah.
 3  Q  What did you find when you got to the back of the room and
 4     found them?
 5  A  They'd been moved.  They were still in the process of
 6     moving from a couple tables to -- to a bigger table.
 7  Q  Were the drink orders then placed?
 8  A  I don't recall whether they'd already ordered their drinks
 9     or -- before or after I got there.  I think -- no, I think
10     they -- I think the waiter came after I got there.
11  Q  And what did you order?
12  A  I ordered a margarita.
13  Q  How many margaritas?
14  A  On the rocks, no salt.
15  Q  How many margaritas did you consume that evening?
16  A  One.
17  Q  Just that one.
18  A  Uh-huh.
19  Q  What about food?  Did you order food?
20  A  I did.
21  Q  How did that take place?
22  A  I looked at the menu and ordered food.  I don't remember
23     what I ordered.  I really don't.  I'm vegetarian and
24     so -- so whatever it was I ordered is with -- some sort of
25     vegetarian entree, probably, cheese enchiladas or
                                                             197
```

```
 1     something like that.
 2  Q  Did anybody take the subject up with the waiter of whether
 3     or -- or did the waiter take the subject up with you or
 4     anybody at the table as to whether or not these advertised
 5     discounts would be available at that time?
 6  A  No.
 7  Q  Did you.....
 8  A  No.
 9  Q  .....have any idea that they might not be?
10  A  No.  I was here for the waiter's testimony and he didn't
11     tell me that -- that -- he never said anything to me
12     about -- about discounts not being available at -- at this
13     location.
14  Q  Did you see any sign in the foyer when you came in that
15     discounts were not -- available only downtown?
16  A  No, what I saw in the foyer were a lot of people, the bar
17     was full, there were a lot of people waiting for tables,
18     and there were like -- there's some sort of a banner or
19     poster or something that was in celebration of their 35th
20     anniversary.  That's what I saw.
21  Q  When did the issue arise of the fact that the advertised
22     discounts would not be offered?
23  A  When we got the bill we asked -- we asked the waiter,
24     well, what about our discounts, what about the discount
25     that was advertised, and that was the first time that
                                                             198
```

Case 3:06-cv-00101-TMB   Document 27-5   Filed 09/28/2006   Page 11 of 15

MUNICIPALITY OF ANCHORAGE    MINOR             TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 215 to 218)

**Page 215**

| | | |
|---|---|---|
| 1 | A | No, I didn't. |
| 2 | Q | You expected..... |
| 3 | A | I'd seen the ad. |
| 4 | Q | .....some form of discount. |
| 5 | A | That's right. |
| 6 | Q | You didn't know what. |
| 7 | A | That's right. |
| 8 | Q | And the menu that you were presented had no discounts on |
| 9 | | it, did it? |
| 10 | A | No. |
| 11 | Q | You ordered anyway. |
| 12 | A | That's right. |
| 13 | Q | Because you expected to get a discount. |
| 14 | A | That's correct. |
| 15 | Q | And when you ordered you had no intention of paying full |
| 16 | | price for anything, did you? |
| 17 | A | That is not correct. |
| 18 | Q | When you ordered you had intention to pay full price? |
| 19 | A | Mr. Spiropoulos, several years ago the Municipality passed |
| 20 | | an ordinance that prohibits happy hours, and I am aware of |
| 21 | | this, you know, I don't do criminal work, but I'm aware of |
| 22 | | this, they passed an ordinance prohibiting happy hours and |
| 23 | | prohibiting the discounting of liquor. So I fully |
| 24 | | expected that we would pay full price for whatever alcohol |
| 25 | | was consumed. |

**Page 216**

| | | |
|---|---|---|
| 1 | Q | And you had no intention of paying full price for any food |
| 2 | | items when you sat down; is that right? |
| 3 | A | I didn't know what they were discounting or how much they |
| 4 | | were going to discount it, but I did not expect to pay -- |
| 5 | | that we would pay the full price for all of the food items |
| 6 | | as was..... |
| 7 | Q | I'm..... |
| 8 | A | .....demanded. |
| 9 | Q | .....not asking you what you expected. I'm asking you did |
| 10 | | you intend to pay full price when you sat down. |
| 11 | A | I intended to pay what the restaurant charged at the |
| 12 | | discounted rate, whatever that was. |
| 13 | Q | You did not intend to pay the items listed on the menu |
| 14 | | when you ordered the food; is that right? |
| 15 | A | I answered the question, Mr. Spiropoulos. |
| 16 | Q | You did not intend to pay the full price listed on the |
| 17 | | menu when you ordered the food; is that right? |
| 18 | | MR. JACOBUS: Objection, asked and answered, Your Honor. |
| 19 | | MR. SPIROPOULOS: She didn't answer the question. |
| 20 | | THE COURT: It's a little different question. Go ahead. |
| 21 | Q | Is that right? |
| 22 | A | Did I intend to pay the full price on the menu for the |
| 23 | | food? I didn't know what the discount was going to be. I |
| 24 | | expected that there was going to be a substantial |
| 25 | | discount. I intended to pay what the restaurant charged |

**Page 217**

| | | |
|---|---|---|
| 1 | | at the discounted rate. They're the ones that advertised |
| 2 | | the discount. |
| 3 | Q | So the answer to my question is no, you did not intend to |
| 4 | | pay full price, correct? |
| 5 | A | That is not entirely correct, no. That is not correct. |
| 6 | Q | Tell the members of the jury how that's not correct. |
| 7 | A | La Mex had advertised that they were going to charge |
| 8 | | prices off of their -- from their 1969 menu. In other |
| 9 | | words, they were going to give a discount. Only because I |
| 10 | | was aware of the municipal ordinance that doesn't permit |
| 11 | | La Mex to discount food -- or alcohol, I expected that |
| 12 | | they would discount the food. |
| 13 | Q | And because..... |
| 14 | A | I didn't know how much they were going to discount it by, |
| 15 | | but I did not expect that they would hand out 1969 menus. |
| 16 | | I expected that we would order off of the current menu. |
| 17 | | Why would they print new menus for one night? I didn't |
| 18 | | expect that. |
| 19 | Q | You did not ask about any discounts, right? |
| 20 | A | No, I didn't. |
| 21 | Q | You did not se any posters or discounts when you got |
| 22 | | there, right? |
| 23 | A | I didn't look. |
| 24 | Q | So the answer to my question is, yes, you didn't see any, |
| 25 | | right? |

**Page 218**

| | | |
|---|---|---|
| 1 | A | I'd already seen the ad, so it didn't matter to me what |
| 2 | | was posted or not posted in the restaurant. |
| 3 | Q | For the third time, then you did not see any |
| 4 | | advertisements for discounts in the Spenard restaurant, |
| 5 | | did you? |
| 6 | A | I don't recall whether I saw any or not. |
| 7 | Q | So first you didn't look. Then you already knew. Now you |
| 8 | | don't recall. Is that your testimony? Where was |
| 9 | | Mr. Gruner when the bill came? |
| 10 | A | He'd either just gotten back or he got back very shortly |
| 11 | | thereafter. |
| 12 | Q | And you said it was your understanding he went to get his |
| 13 | | checkbook. |
| 14 | A | That's right. |
| 15 | Q | You heard him testify, right? |
| 16 | A | Yeah; Uh-huh. |
| 17 | Q | You were seated in court? |
| 18 | A | Uh-huh. |
| 19 | Q | You heard me read my -- his affidavit to him? |
| 20 | A | Uh-huh. |
| 21 | Q | You heard where he said I did not have the advertisement |
| 22 | | with me, but returned home to get it when the dispute |
| 23 | | subsequently arose. You heard him say yes to that, right? |
| 24 | A | I heard him say that that was what was in the affidavit, |
| 25 | | yes. |

Case 3:06-cv-00101-TMB   Document 27-5   Filed 09/28/2006   Page 12 of 15

MUNICIPALITY OF ANCHORAGE v. MINOR                    TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                      SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 227 to 230)

**Page 227**

1  A  Yes.
2  Q  You also said in front of this jury today that this is a
3     civil matter, right?
4  A  Yes.
5  Q  And didn't you also in fact tell the manager, Ms. Ablecop,
6     that these cases never go to court?
7  A  No, I did not tell her that.
8  Q  Your defense counsel mentioned in closing -- opening
9     statement that you're not the kind of person to be pushed
10    around. Do you agree with that?
11 A  Yes, I do.
12 Q  And when you say that kind of thing, won't be pushed
13    around, what does that mean to you?
14 A  Well, my counsel said it. He's known me for many years.
15    Maybe he knows.
16    MR. JACOBUS: I would have to tell the jury, though.
17 Q  What does it mean to you?
18 A  Won't be pushed around?
19 Q  Uh-huh.
20 A  Well, it can mean many different things in -- depending on
21    the context.
22 Q  In this context. Well, let me back up. The waiter told
23    you that this was the bill, right?
24 A  No, the waiter told Bob that.
25 Q  Okay. You were there; you heard it?

**Page 228**

1  A  Actually, I don't know if the waiter said anything. I
2     think he sent -- set the bill down next to Bob.
3  Q  The manager told you this was the bill, right?
4  A  Yes.
5  Q  She told you that you had to pay the full amount.
6  A  Yes.
7  Q  And you were paying for the group, right?
8  A  Well, we hadn't really decided that I was going to pay for
9     the group. I was the one who ended up talking to the
10    manager.
11 Q  At some point it was decided that you were going to pay
12    for the group.
13 A  That's right.
14 Q  And you kind of assumed responsibility for the bill then.
15 A  Yes, I'd say by default, yes. I was the one who was
16    dealing with -- with the manager.
17 Q  And when Officer Bell arrives he told you you needed to
18    pay the full amount.
19 A  Officer Bell said a number of different things. I don't
20    know that he used the words that I needed to pay the full
21    amount. I don't believe he used those specific words.....
22 Q  He used words to.....
23 A  .....but he might have.
24 Q  .....that effect?
25 A  Words to that effect, yes, he did.

**Page 229**

1  Q  Something -- the bill needs to be paid or you guys need to
2     pay it or you need to pay it, something of that nature?
3     Is that basically what I'm understanding, then?
4  A  Well, there was a lot more to it than that, sir.
5  Q  Like what?
6  A  You're -- you're -- you're asking me to recollect exactly
7     what Officer Bell said to me when he got there? I can't
8     remember everything he said to me when -- during
9     this -- this was a fairly long period of time.
10 Q  But it was something to the effect of -- my question was
11    it was something to the effect of you need to pay or the
12    bill needs to be paid or you all need to pay, and you said
13    there's a lot more to it than that.
14 A  No, no, I meant......
15 Q  What do you mean when you say there's a lot more to it
16    than that?
17 A  I'm sorry, maybe you misunderstood. My response to your
18    question was there was a lot more that went on other than
19    just Mr. -- or Officer Bell saying that I needed to pay
20    the bill.
21 Q  But at some point that was conveyed to you, right? Sorry,
22    lawyer speak. He said that at some point, right?
23 A  Or words to that effect, yes, he did.
24 Q  Then Sergeant Leblanc came.
25 A  Right.

**Page 230**

1  Q  He told you the same kind of thing, right?
2  A  More or less.
3  Q  Conveyed the same general information?
4  A  The tenor of what Sergeant Leblanc had to say was more
5     that La Mex wanted to have me arrested.
6  Q  He told you that the bill needed to be paid in full,
7     right?
8  A  I -- I believe I've answered that previously.
9  Q  So the answer is yes, he told you the bill needed to be
10    paid in full. He got your side of the story, right?
11 A  I'm sorry?
12 Q  He got your side of the story?
13 A  I believe he did.
14 Q  You talked to him.
15 A  I did, I talked to him.
16 Q  He was looking at you.
17 A  Right.
18 Q  And after that, after he'd spoken with you, he told you
19    words to the effect of this bill needs to be paid, right?
20 A  Or he would arrest me.
21 Q  Or he would arrest you.
22 A  Uh-huh. That's what he said, that.....
23 Q  So Sergeant Leblanc was the.....
24 A  .....La Mex wanted to have me arrested.
25 Q  .....third person that told you the bill needed to be

Case 3:06-cv-00101-TMB    Document 27-5    Filed 09/28/2006    Page 13 of 15

MUNICIPALITY OF ANCHORAGE    MINOR    TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR    SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 231 to 234)

**Page 231**

1      paid. Yes?
2  A  Or words to that effect, yes.
3      MR. SPIROPOULOS: Now, I'll show opposing counsel.....
4      MR. JACOBUS: No, I've seen that. Sure, yeah.
5      MR. SPIROPOULOS: C -- I believe it's C1 and 2 or group
6      Exhibit C (indiscernible) the originals. May I approach?
7      THE COURT: Yes.
8  Q  Showing you Exhibit C, which was in evidence, which
9      is -- which you had said is the calculations in this case,
10     is it your handwriting?
11 A  Yes, it is.
12 Q  You made the calculations?
13 A  I think Max and I both made the calculations.
14 Q  You did the handwriting.
15 A  I did the handwriting. I was the one with the paper and
16     the pen.
17 Q  Is Max one of those guys that can do like math in his
18     head?
19 A  He's pretty good at it.
20 Q  Okay. So he kind of helped you work through the
21     calculations?
22 A  Well, we -- I think we all did it together.
23 Q  Right, but.....
24 A  Yeah.
25 Q  .....you wrote them out.

**Page 232**

1  A  Yeah, I wrote it down. Yes, that's my handwriting.
2  Q  Okay. And while you were going through the calculations
3      you were looking at the numbers, doing the adding and the
4      subtracting, right?
5  A  Yes.
6  Q  Okay. And on the back page of one of those there's some
7      notes.
8  A  Right.
9  Q  You wrote down something about a waitress, right?
10 A  That's right.
11 Q  Who was this waitress?
12 A  Well, when -- when you showed these notes to me it
13     refreshed my recollection about another trans-- another
14     event that occurred at the cashier stand, which was that
15     the cashier or waitress was another person that I had
16     talked to, and that was who I think took the check.
17 Q  But you wrote that she was a waitress, right?
18 A  Right. Uh-huh.
19 Q  Not a cashier.
20 A  Not a -- well, she said she was a waitress or I wouldn't
21     have written down waitress.
22 Q  You didn't write down the physical descriptions of your
23     waiter, did you?
24 A  I -- I didn't remember what he looked like.
25 Q  You didn't write waiter, don't remember what looked like.

**Page 233**

1  A  No, I didn't. I don't usually record what I don't
2      remember.
3  Q  And at the end of your direct examination -- I'm sorry,
4      let me back up. Did you agree with this 35-percent
5      reduction?
6  A  Yes.
7  Q  You wouldn't have agreed with 10-dollar reduction.
8  A  No.
9  Q  That's what they offered at some point.
10 A  Well, it was less than that. It was somewhere around
11     that.
12 Q  Somewhere around 10 bucks?
13 A  Yeah. Uh-huh.
14 Q  Less? How much less?
15 A  I don't -- I really don't recall, but it wasn't -- it was
16     $10 or less, but I don't remember whether it was $9.95 or
17     $7.32. I don't remember. I just don't remember, and I
18     didn't write it down, because when she came back she
19     retracted it anyway.
20 Q  Okay. And your -- you had testified -- did you offer your
21     business card as well?
22 A  No, I didn't. I didn't have one. I don't normally carry
23     business cards on me.
24 Q  Okay. And you said on direct that you issued a -- you
25     wrote a check, right?

**Page 234**

1  A  Right.
2  Q  And at 2:13 and 15 seconds this afternoon according to the
3      clock you indicated to this jury that you discounted that
4      check for purposes of negotiating with the manager; is
5      that right?
6  A  No, I had discounted the bill for purposes of negotiating
7      with the manager.
8  Q  Okay.
9  A  Not the check. The bill.
10 Q  The check you wrote, I mean.
11 A  Uh-huh. Then I wrote it for -- then I wrote it for that
12     amount.
13 Q  For purposes of discounting -- or for purposes of
14     negotiating with the manager.
15 A  No, I did the calculations for purposes of negotiating
16     with the manager.
17 Q  So when you issued -- when you handed them your check as
18     far as you were concerned the negotiations were over. Is
19     that right?
20 A  Yes.
21 Q  You heard your witnesses who came and testified that they
22     offered business cards to continue negotiation? Right?
23 A  That was earlier, I think.
24 Q  Before the check was presented?
25 A  I don't remember now. I'm sorry, I just don't remember

Case 3:06-cv-00101-TMB   Document 27-5   Filed 09/28/2006   Page 14 of 15

MUNICIPALITY OF ANC. AGE v. MINOR                ANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                     SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 235 to 238)

**Page 235**

1     now.
2 Q Because that's why you wrote payment in full.
3 A That's right.
4 Q You weren't offering this as partial payment and we'll
5     figure this out later.
6 A What I did when I gave the check to the -- first of all, I
7     talked to the manager and I showed her the calculations
8     and how we'd come up with this, and I explained to her how
9     we'd come up with -- with this, and -- and that was when
10     she sort of threw up her hands, as I recall, and walked
11     away and said I can't deal with this.
12 Q My question was you didn't offer this as partial payment
13     and we'll figure this out later. Right?
14 A No. I offered the check specifically telling her -- or
15     telling the -- I think it was the cashier I told. Maybe
16     it was the wait-- the manager -- that this was -- that the
17     check that we -- that I was paying, we were paying the
18     full amount that we felt was due, given what the ad had
19     promised for discounts, and she had our names, she had our
20     telephone numbers, and she didn't want to -- she wouldn't
21     let me talk to the manager at the time. I tendered the
22     check with payment in full written on the front, and if
23     they had a problem with it they could call me. That was
24     what I told them.
25 Q So you gave her your name and number even though you

**Page 236**

1     didn't have a business card?
2 A Even though I didn't have a business card, it was on my
3     check. They had my check.
4 Q Okay. And so this was all you were going to pay. Right?
5 A That was what I was going to pay them at the time, that's
6     right.
7 Q What do you mean at the time?
8 A If anybody had ever contacted me about this, I was going
9     to -- going to -- going to talk to them about -- you know,
10     about what we felt probably was due back to us under the
11     discount. Nobody ever contacted any of us as far as I
12     know. Nobody contacted me.
13 Q When you -- so you mean -- when you say at the time, you
14     mean this is more than you should have paid, so you were
15     expecting them to contact you to try and get -- you were
16     going to get money back from them.
17 A Possibly. I don't know. Nobody called me back.
18 Q When people.....
19 A Nobody would talk to me.
20 Q When you overpay somebody do they usually call you and
21     tell you?
22 A I didn't expect them to, no.
23 Q Then why did you just tell this jury that you were
24     expecting somebody to contact you?
25 A If they had a problem with the payment, then they could

**Page 237**

1     call me.
2 Q You didn't think.....
3 A That was what I told them.
4 Q And this was intended. You were not going to negotiate
5     this any further. This was the only amount you were going
6     to offer, right?
7 A At the time, that's true, yes. At the time.
8 Q Back to where we started, what do you mean at the time?
9     Does that mean you were willing to pay more later? A yes
10     or no.....
11 A Possibly.
12 Q .....will do.
13 A Possibly. Nobody ever contacted me from the restaurant
14     ever.
15 Q If that was a possibility, why did you write payment in
16     full?
17 A That's what I wrote on the check when I handed it to them,
18     and finally when we were -- when the manager wouldn't talk
19     to us anymore, that's what I wrote on the front of the
20     check. I'd written the check first. Then I wrote for
21     payment in full down at the bottom.
22 Q And you just told this jury that there was a possibility
23     had they called you in the future you might have paid
24     more. Is that what your testimony is?
25 A That's right.

**Page 238**

1 Q Even though this check says payment in full.
2 A That's right. When I tendered the check, Mr. Spiropoulos,
3     the manager told me that they wouldn't accept it. Then
4     she took it.
5 Q And you heard her testify, right?
6 A Yes, I did.
7 Q You heard her say they ran the check through because
8     they're running a business and they're going to get what
9     they can get. Words.....
10 A That's what she.....
11 Q .....to that effect.
12 A .....said, as I recall. Uh-huh.
13 Q You would not have ordered anything at full price food
14     wise that night.
15 A That's correct.
16 Q You would not have paid full price that night.
17 A We were there on the ad. We did.....
18 Q You.....
19 A .....not expect -- we expected to pay a discounted price.
20 Q So you would not have paid full price that night, correct?
21 A We would not have ordered and eaten there if we thought
22     that we would have had to pay -- if I had thought that we
23     had to pay full price I would not have eaten there.
24 Q But you didn't have to pay full price because the manager
25     offered you $10 or so off. Right?

MUNICIPALITY OF ANCHORAGE    MINOR                    TRANSCRIPT OF PROCEEDINGS
CASE NO. 3AN-04-03149 CR                        SEPTEMBER 8, OCTOBER 5 & OCTOBER 6, 2004

(Pages 239 to 240)

```
 1   A    That was not what was promised in the ad, sir.
 2   Q    This ad says more than $10 off?
 3   A    I think the ad speaks for itself.
 4   Q    The ad speaks, it says with prices on the menu from the
 5        day we opened. Right?
 6   A    That's what it says.
 7   Q    Your menu prices were not lower, were they?
 8   A    I did not expect them to give us a 1969 menu. I told you
 9        that.
10   Q    I'll take that as a yes.
11        MR. SPIROPOULOS: Nothing further, Judge.
12        THE COURT: Any redirect?
13        MR. JACOBUS: No, Your Honor.
14        THE COURT: Okay, thank you. You may step down.
15        (Witness excused)
16   3:22:46
17              END OF REQUESTED PORTION
18   /
19   /
20   /
21   /
22   /
23   /
24   /
25   /
                                                   239
```

```
 1              TRANSCRIBER'S CERTIFICATE
 2
 3      I, Dana J. Kelly, Certified Electronic Transcriber, hereby
 4
 5   certify:
 6
 7      That the foregoing pages numbered 1 through 238 are a
 8
 9   true, accurate and complete transcript of proceedings in Case
10
     No. 3AN-04-3149 CR, MOA v. Minor, transcribed by me from a copy
11
     of the electronic sound recording to the best of my knowledge
12
     and ability.
13
        DATED: June 12, 2006.
14
15
                    _____
16                      Dana J. Kelly, CET
17
18
19
20
21
22
23
24
25
                                                   240
```

TRANSCRIPTS ONLY
(907) 276-0306